**PEGASUS HOLDINGS, a California limited partnership, and Pacific Strategies Funds Group, Inc., Plaintiffs,**

v.

**VETERINARY CENTERS OF AMERICA, INC., Robert L. Antin, Arthur J. Antin, Thomas W. Fuller, Deborah W. Moore, and Neil Tauber, Defendants.**

No. SACV 99–167 DOC EEX.

United States District Court,
C.D. California.

Oct. 6, 1998.

Brian C. Lysaght, Edward A. Klein, Katharine Ann Kates, O'Neill Lysaght & Sun, Santa Monica, CA, for Plaintiffs.

David Siegel, Daniel P.Lefler, Patrick O. Hunnius, Irell & Manella, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOORE, TAUBER, AND ARTHUR ANTIN'S MOTION TO DISMISS

MORENO, District Judge.

### I.

### INTRODUCTION AND FACTUAL BACKGROUND

This cause of action, filed on or about June 19, 1998, arises from an allegedly fraudulent scheme involving securities. In 1996, defendants, who occupied various positions of control at Veterinary Centers of America ("VCA")[1], sold large amounts of VCA stock at a comparatively high price while completing three major mergers and acquisitions. Through such activities, defendants were able to make substantial profits and prevent dilution of the stock from occurring. However, once the mergers were complete, plaintiffs allege that defendants issued themselves stock options while the stock price fell, in order to make further profits after it regained part of its former value. As part of the scheme, plaintiffs allege that particular defendants misrepresented the financial condition of Veterinary Centers of America, Inc. ("VCA"), the value of VCA stock, the profitability of VCA's pet food line, and the potential benefits of the mergers with Pet Practice and Pets RX in telephone conversations and meetings with plaintiffs' representatives from July to October, 1996. Plaintiffs also allege that defendants failed to disclose substantial problems with the integration of VCA's operations with Pet Practice and Pets Rx and that VCA's profits for the third and fourth quarter of 1996 would be drastically affected. Finally, plaintiffs allege that all defendants willfully consented to the dissemination of the misrepresentations and failed to disclose the truth. According to plaintiffs, these allegations, collectively, state a claim against defendants under Section 10(b) and Rule 10b–5 for their participation in a scheme to defraud.

Defendants Moore, A. Antin, and Tauber (collectively the "Non–Speaking defendants") argue in response that (1) plaintiffs have failed to attribute either statements, omissions, or predicate manipulative acts to them specifically in violation of Rule 9(b)'s requirement of particularity; (2) that a "group pleading" presumption does not apply to oral statements made by specific defendants R. Antin and Fuller, who are also named as individual defendants in the Complaint.

### II.

### LEGAL STANDARD

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the legal sufficiency of the

---

1. Defendant Robert L. Antin ("R.Antin") was at all times relevant, the president, chief executive officer and the chairman of the board of directors of defendant VCA. Defendant Arthur J. Antin ("A.Antin") was, at all times relevant, the chief operating officer, senior vice president, secretary, and a director of defendant VCA. Defendant Thomas W. Fuller ("Fuller") was, at all times relevant, the chief financial officer of defendant VCA. Defendant Neil Tauber ("Tauber") was, at all times relevant, the senior vice president and a director of defendant VCA. Defendant Deborah W. Moore ("Moore") was, at all times relevant, the controller, vice president, and principal accounting officer of defendant VCA.

claims asserted in the complaint. Accordingly, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint. *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir.1994). The court may, however, consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989); *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir. 1988). "[A] document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned." *Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994).

Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988). The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Development Corp.,* 108 F.3d 246, 249 (9th Cir.1997). When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Barron v. Reich,* 13 F.3d 1370, 1374 (9th Cir.1994). The court is not required, however, to accept "conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg,* 18 F.3d at 754–55.

Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). The notice pleading standard set forth in Rule 8 establishes "a powerful presumption against rejecting pleadings for failure to state a claim." *Gil-*

*ligan,* 108 F.3d at 248 (citations omitted). Consequently, a court may not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by the inclusion of additional factual allegations. *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995).

Where plaintiff's complaint should be dismissed for failure to state a claim, the plaintiff should be given "at least one more chance to amend the complaint" under Fed.R.Civ.Proc. 15(a) before dismissing the action with prejudice. *Bank v. Pitt,* 928 F.2d 1108, 1112 (11th Cir.1991). A plaintiff should be denied leave to amend a complaint, if the court determines that "allegations or other facts consistent with the challenged pleading could not possibly cure the defect." *Schreiber Distributing Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986).

Notwithstanding the liberality of Rule 8(a)(2), Rule 9(b) of the Federal Rules requires that "the circumstances constituting fraud or mistake [be] stated with particularity." When plaintiffs allege fraud, the complaint "must set forth the circumstances indicating the falseness of the statements, including the time, place, and content of the allegedly fraudulent representation or omission, as well as the identity of the person allegedly perpetrating the fraud." *California ex rel. Mueller v. Walgreen Corporation,* 175 F.R.D. 631, 634 (N.D.Cal.1997), citing *In re GlenFed Inc. Securities Litigation,* 42 F.3d 1541, 1545 (9th Cir.1994).

Securities fraud claims must also satisfy 9(b). *In re Stac Electronics Securities Litigation,* 89 F.3d 1399, 1404 (9th Cir. 1996). Not only must plaintiffs state the "time, place, and nature of the alleged fraudulent activities," but they must speci-

fy "what is false and misleading about a statement, and why it is false." Plaintiffs must also state "why the disputed statement was untrue or misleading *when made.*" *In re GlenFed, Inc. Securities,* supra, 42 F.3d at 1548–49 (emphasis in original). As the Ninth Circuit explained: "The fact that an allegedly false statement and a later statement are different does not necessarily amount to an explanation as to why the earlier statement was false." *Id.* at 1549. The requirements of Rule 9(b) may be "relaxed as to matters peculiarly within the opposing party's knowledge," if the plaintiffs cannot be expected to have personal knowledge of the facts prior to discovery. *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1439 (9th Cir. 1987).

The purpose of Rule 9(b) serves to give defendants adequate notice to permit them to defend against the charge and to deter the filing of complaints "as a pretext for the discovery of unknown wrongs," to protect professionals from the reputational harms that accompany fraud charges, and to "prohibit [ ] plaintiff[s] from unilaterally imposing upon the court, the parties, and society enormous social and economic costs absent some factual basis." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985). *See also In re Stac Electronics Securities Litigation,* 89 F.3d 1399 (9th Cir.1996).

To curtail the filing of abusive lawsuits, in 1995, Congress enacted securities law reforms. S.Rep. No. 98, 104th Cong., 1st Sess. 15 (1995); H.R.Conf.Rep. No. 369, 104th Cong., 1st Sess. 41 (1995). To accomplish this, the Reform Act provides:

> In any private action arising under this title in which the plaintiff alleges that the defendant—(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading: the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1) The Reform Act also provides a "Safe Harbor" for so-called forward looking statements. "Where a plaintiff alleges false forward-looking statements, the 'required state of mind' is 'actual knowledge' that the statement was false at the time it was made. Where a complaint fails to satisfy these standards, 'the court shall, on the motion of any defendant, dismiss the complaint.'" *Molinari v. Symantec Corporation,* 1998 WL 78120 at *3 (N.D.Cal. Feb.17, 1998). Leave to amend is ordinarily given freely as to those portions of a complaint which the district court finds do not state a claim for relief. Fed.R.Civ.P. 15(a).

### III.

### *ANALYSIS AND DISCUSSION*

To state a securities fraud claim under Section 10(b) of the Securities Exchange Act, and Rule 10b–5 promulgated thereunder, a plaintiff must allege that the defendants made (1) a misstatement or omission of a material fact, (2) with scienter, (3) upon which the plaintiff relied, and (4) which caused injury to the plaintiff. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

Plaintiff's complaint begins with a description of several public statements made in press releases that announce recent VCA acquisitions. On January 12, 1996, Robert Antin, President of the company and chairman of its board of directors, announced the purchase of three independent animal hospitals, stating

> The completion of these three acquisitions ... illustrates our commitment to expanding VCA's nationwide network of hospitals in 1996. With net proceeds of over $34 million from our recently completed public offering, we now have ample capital to continue the aggressive hospital acquisition program that we accelerated in 1995.

In March, defendants also announced another major merger with The Pet Practice, a company which operated 84 veterinary clinics in 11 states. In announcing the merger, defendants stated, in a press release:

> This is a natural extension of our consolidation strategy. This merger will combine the two largest veterinary hospital chains in the nation, allowing us to share operating systems and the strong management teams which we have developed.... By adding The Pet Practice hospital network to our company, we expect to expose it to our strong teaching and specialty programs, creating opportunities for revenue growth. We also see the potential to offer our laboratory services to The Pet Practice hospital network, allowing us to expand our laboratories into these new markets ... and expand distribution of our pet foods ... This merger also provides the combined company significant opportunities to realize the efficiencies and synergies available by operating with one corporate overhead ... We expect to realize significant cost savings and in the combination, particularly in the areas of purchasing both medical supplies and office supplies, insurance, communications and other administrative expenses. We also believe economies can be realized in such areas as marketing, advertising, training and continuing education.

The market reacted favorably to the news of the recent acquisitions, and VCA stock enjoyed a high period. However, during the same time, the individual defendants sold significant amounts of their own VCA holdings, selling a total of nearly half a million shares. After news of these sales became public, the price of VCA stock declined. In response to this drop, plaintiffs, without specific identification, allege collectively that "defendants" made several reassurances, among them that the acquisitions of Pets Rx and Pet Practice were preceding as planned, and would be highly profitable for VCA. Those assurances allegedly allowed the price of VCA stock to stabilize.

In July of 1996, plaintiffs had a series of telephone conversations with R. Antin and Fuller regarding the possibility of making a major investment in VCA stock. In those conversations, R. Antin allegedly told plaintiffs' representatives that

> acquisition of the Pet Practice was on track and VCA was confident that it would be a positive step for the company. R. Antin and Fuller represented that after ten years of acquiring animal hospitals, VCA had a clear understanding of the fixed costs and the costs of integrating new operations with their existing network. They further represented that the acquisitions of Pets RX and Pet Practice would be accrete [sic], that significant cost savings would be achieved immediately, that growth of earnings would also continue at a very rapid rate, and that the pet food business would be profitable in 1996 and again grow rapidly.

Based on these oral predictions, plaintiffs commenced an investment program in VCA, purchasing approximately 350,000 shares at a total cost of $6 million dollars.

According to plaintiffs, at the time, defendants were aware of facts that indicated that the low profit margins of the Pets Rx and Pet Practice hospitals would make it

> impossible for the acquisition of these hospitals to be accrete [sic]. In addition, integration of these hospitals would be virtually impossible in the short term and cost savings or earnings growth would not be achieved for some considerable time, much less immediately. Further, at the time of the representations, the pet food business was losing money, and there were no prospects that the pet food sector could achieve a profit in 1996 or that the business would grow.

Plaintiffs point out that had they been aware of these facts, they would not have purchased VCA stock at the price they paid, or at all.

In a subsequent face-to-face meeting with R. Antin and Tom Fuller, R. Antin made a number of similar predictions,

among others: the gross profit margin of the Pet Practice would be significantly higher due to the elimination of overhead expenses; a recent $100 million value joint venture with Heinz in pet food would be a significant "value builder;" and the pet food business would be profitable in 1996. In reliance of these oral statements made by R. Antin, plaintiffs continued their investment program in VCA.

Plaintiffs argue that the statements made during the meeting were false and misleading because defendants knew at the time that neither the acquisition of Pet Practice, nor the stand alone hospitals, would encounter substantial obstacles to accretion; that various high costs would prevent immediate profitability; that the acquisitions did not meet a minimum profit margin of 18%; that the Heinz joint venture was losing money and would continue to do so and the pet food sector could not earn a profit in 1996.

Plaintiffs also allege that their representatives had another conversation with Fuller in October of 1996, in which he represented to them that VCA was "on track" to meet the Wall Street consensus earnings of .16 per share for the third quarter of 1996; that after cost savings, the profit margins on Pet Practice hospitals were close to 18%; and that the pet food line would be profitable on a stand alone basis and would continue to achieve a greater profit margin. As a result of this conversation, plaintiffs continued their investment program in VCA.

Plaintiffs now allege the falsity of those predictions, pointing out that at the time they were made, Defendants were aware, among other facts, that VCA could not meet the earnings estimate of .16 per share; that VCA could not attain an 18% profit margin at the Pet Practice and Pets Rx hospitals; and that the pet food line would not achieve profitability in 1998.

In November of 1996, VCA announced its third quarter earnings, which were substantially lower than anticipated. As a result of this announcement, the stock price fell significantly defendants then al-legedly issued themselves options. According to plaintiffs,

By inflating the stock price during the second and third quarters of 1996, Defendants were able to sell their stock at the highest price possible, and to use fewer shares to acquire Pets Rx and Pet Practice. By using fewer shares to acquire these entities, they avoided diluting the value of their remaining shares. Once the acquisition was complete, Defendants allowed the price to fall. At this time, they issued options for over 2 million shares, when the stock was at a low. Defendants realized significant profits when the stock regained some of its former value after the costly integration with Pets Rx and Pet Practice was complete.

Based on these allegations, plaintiffs believe that each of the defendants knew or had access to the material adverse non-public information about VCA's results and failed to disclose that information. Furthermore, plaintiffs allege that each of the defendants participated in drafting and approved false and misleading public statements.

▌ The crux of the dispute in this motion involves the three non-speaking defendants, who have not been charged with any specific predicate acts of fraudulent behavior, but who are nonetheless included as defendants in the complaint. Defendants argue, and rightfully so, that plaintiffs have failed to attribute any misleading statements to the non-speaking defendants Moore, Tauber, and Arthur Antin. Plaintiffs' failure to attribute any misleading statements or omissions to the non-speaking defendants violates Rule 9(b) of the Federal Rules of Civil Procedure's requirement of pleading with particularity. To state a claim of fraudulent conduct, which carries substantial reputational costs, plaintiffs must provide each and every defendant with enough information to enable them "to know what misrepresentations are attributable to them and what fraudulent conduct they are charged with."

*In re Worlds of Wonder Sec. Litig.*, 694 F.Supp. 1427, 1433 (N.D.Cal.1988).

The Court finds that plaintiffs' allegations against the non-speaking defendants are insufficient to state a claim for fraud because *every alleged misrepresentation cited in the Complaint allegedly was communicated to plaintiffs by either Robert Antin or Thomas Fuller.* Specifically, plaintiffs allege that misrepresentations were communicated on three occasions. First, when their "representatives" spoke with R. Antin and T. Fuller by telephone in July of 1996; second, in a face-to-face meeting with R. Antin, A. Antin, and Tom Fuller present that same month; third, in a telephone conversation with Tom Fuller on October 30, 1996. No other misrepresentations are alleged, or even suggested, in the Complaint.

None of the non-speaking defendants is alleged to have made *any* representations to the plaintiffs, let alone performed predicate acts in furtherance of the scheme. Ms. Moore and Mr. Tauber are mentioned only once in the Complaint, and then only by way of identifying their respective positions in the organization. Neither Ms. Moore, nor Mr. Tauber is alleged even to have participated or been privy to the telephone calls or the meeting in which the alleged misrepresentations occurred. Furthermore, with respect to A. Artin, while it may be true that he attended the aforementioned meeting, plaintiffs do not attribute any specific statements or behavior to him. All of the alleged misrepresentations made during the course of the meeting are attributed solely to R. Artin.

In support of its Complaint, plaintiffs argue that the Ninth Circuit applies a "presumption of collective action to all officers of a corporation for misrepresentations and omissions contained in public statements." Plaintiffs' Opposition at 1. While this is certainly true, plaintiffs fail to explain how the alleged public statements made in the Complaint—which involve announcements of recent acquisitions—are misrepresentations or otherwise fraudulent statements.

Indeed, in its Opposition, plaintiffs even recognize that not all defendants made misrepresentations. In the Complaint, Plaintiffs observe that "certain" defendants misrepresented the financial condition of VCA, the value of VCA stock, the profitability of VCA's pet food line; and the potential benefits of the mergers with Pet Practice and Pets Rx in telephone conversations and meetings. Even if such statements were made with knowledge of their falsity, the Court cannot, in good conscience, extend blame to the non-speaking defendants without some facts suggesting involvement. Plaintiffs' blanket allegation that "all" defendants "willfully consented" is simply not enough. Plaintiffs fail to address how the non-speaking individuals were involved in the scheme, and the acts each performed (or omitted) which furthered the conspiracy.

Plaintiff's alleged "scheme" theory of liability is not only inartfully drawn, but also fundamentally inconsistent with judicial interpretations of section 10(b), which, according to the Supreme Court in *Central Bank of Denver v. First Interstate Bank of Denver,* "prohibits only the making of a material misstatement (or omission) ... or the commission of a manipulative act." Secondary actors may only be held liable assuming all of the requirements for primary liability under Rule 10b–5 have already been met. 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

Allegations of stock ownership and attendance at certain meetings is not enough to establish a functional relationship to a fraudulent scheme. Plaintiffs have failed to provide examples of particular actions (or omissions) on the part of the non-speaking defendants that satisfy those requirements. Conclusory allegations of "willful consent" are insufficient to state a cause of action without factual information as to how and when the non-speaking defendants "consented," to whom they expressed, exhibited, or otherwise demonstrated their consent. As defendants have already observed,

A conclusory allegation of 'willful consent'—which could be leveled against any officer or director of a publicly traded company—is not the same thing as a particularized allegation of wrongful conduct and plaintiffs cite no authority holding that such conclusory allegations are sufficient to state a claim under *Central Bank.*

As the Ninth Circuit has observed, "it is not reasonable to presume in every case . . . that a 'corporate scheme to defraud was collectively devised.'" *In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 593 (9th Cir. 1995) (citation omitted).

In support of their arguments, Plaintiffs cite to *Cooper v. Pickett,* a Ninth Circuit case in which a group of defendants were each held liable for a scheme to defraud. However, the operative difference between *Cooper* and the instant case is that plaintiffs had alleged specific acts in furtherance of the scheme by all of the defendants—namely, that they "made misleading statements to [ ] analysts with the intend that the analysts communicate those statements to the market." *Cooper,* 137 F.3d 616 (9th Cir.1998). *Cooper* is entirely consistent, therefore, with *Central Bank's* requirement that wrongful conduct be alleged against each defendant. In fact, the *Cooper* court specifically observed that "*Central Bank* does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as *each defendant committed a manipulative or deceptive act* in furtherance of the scheme." *Id.* Plaintiffs fail to offer any other supportive case law that even barely suggests that mere allegations of "willful consent" are sufficient to hold a person liable for a securities fraud.[2]

Second, while we agree with Plaintiffs that the non-speaking defendants may be held liable on a "group pleading" theory, it is fairly well settled that the doctrine applies only to public statements by a corporations's officers, not oral statements made by one particular officer. *See In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1240 (N.D.Cal.1994) (holding that oral statements attributable to individual defendants are actionable against only those defendants). As the doctrine is limited to group published information, such as press releases or annual reports, it, by its very nature, cannot hold individual defendants for oral remarks made by others. *Strassman v. Fresh Choice, Inc.,* 1995 WL 743728 (N.D.Cal. Dec.7, 1995), *In re Rasterops Corp. Sec. Litig.,* [1993–94 Transfer Binder] Fed.Sec.L.Rep. (CCH) 98, 231, at 99, 602–03, 1994 WL 374332 (N.D.Cal. 1994). Put another way, written or oral statements made by an identified defendant cannot be classified as "group published" information. *See Molinari v. Symantec Corp.,* 1998 WL 78120 (N.D.Cal. Feb.17, 1998).

Plaintiffs fail to allege any public misrepresentations that fall within the group pleading presumption. While the Complaint does make reference to four public statements announcing recent acquisitions that would fall under the "group pleading" presumption, nowhere do plaintiffs suggest that they purchased VCA stock in reliance of those statements, nor that such statements were indeed false.[3] "To successfully allege securities fraud under Rule 10b–5, plaintiffs must allege reliance on a material misstatement, and scienter." *In re Gupta,* 900 F.Supp. 1217, 1228 (N.D.Cal. 1994) Plaintiffs fail to allege (1) reliance on (2) a material misstatement and (3) scien-

---

2. The Court interprets "willful consent" as simply another way of saying that plaintiffs "aided and abetted" the allegedly fraudulent scheme. However, *Central Bank* foreclosed this possibility, holding that "there is no private aiding and abetting liability under § 10(b)." *Id.* at 191, 114 S.Ct. 1439.

3. Courts have often held that general statements of optimism about the future and "puffing" about a company are not actionable. However, the announcements made would appear to fall into this category. *See In re Gupta,* 900 F.Supp. at 1235 (listing citations), and *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1095 (N.D.Cal.1994).

ter. Furthermore, plaintiffs purchased VCA stock in reliance on false *oral,* not written, statements made "in telephone conversations and meetings with plaintiffs from July to October, 1996." Consequently, the Court finds that plaintiffs have failed to successfully attribute misstatements, omissions, or other fraudulent conduct on the part of the non-speaking defendants.

In sum, in order to state a claim against the non-speaking defendants, plaintiffs must demonstrate more than the complaint currently alleges. First, plaintiffs must attribute particular misstatements, omissions, or otherwise manipulative conduct on the part of each and every defendant listed. Second, in order to hold individual defendants liable under the "group pleading" presumption, plaintiffs must (1) explain the nature of the misrepresentation in the published statement; and (2) establish that the defendants were involved in the day-to-day management of those parts of the corporation involved in the alleged fraud. *See In Re Rasterops Sec. Litig.,* 1994 WL 374332 (N.D.Cal. April 20, 1994), and *Molinari,* 1998 WL 78120 at * 11 (requiring evidence that the named defendant is 'functionally related' to the alleged fraud). Since it is well settled that allegations must identify the individual defendants responsible for the fraudulent representations, this Court finds the converse to also be true: namely, that *allegations must identify the fraudulent misrepresentations made by individual defendants. See In re Storage Technology Corp. Sec. Litig.,* 804 F.Supp. 1368, 1372 (D.Colo.1992).

## IV.

### CONCLUSION

Given the severe reputational penalties and significant social cost of securities fraud allegations, a more specific statement of the allegedly fraudulent behavior is required. For the foregoing reasons, the Court dismisses the three non-speak-

ing defendants with leave to amend until November 2, 1998.

IT IS SO ORDERED.